## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Sheila Reed,

        Plaintiff,

v.

Kilolo Kijakazi,
Acting Commissioner of
Social Security,

        Defendant.

_____

Case No. 21-12712
District Judge Thomas L. Ludington
Magistrate Judge Jonathan J.C. Grey

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

    Sheila Reed seeks judicial review of the Acting Commissioner of Social

Security's ("Commissioner") final decision denying Reed's application for

disability insurance benefits under the Social Security Act. On June 13, 2022, Reed

filed a motion for summary judgment (ECF No. 14), and on August 2, 2022, the

Commissioner filed a cross-motion for summary judgment (ECF No. 16).

    For the following reasons, the Court **RECOMMENDS** that the

Commissioner's motion for summary judgment (ECF No. 16) be **GRANTED**,

Reed's motion for summary judgment (ECF No. 14) be **DENIED**, and the decision

of the Commissioner be **AFFIRMED**.

## I.   Background

### A. Procedural history

On January 6, 2016, Reed filed an application for a period of disability and disability insurance benefits. (Tr. 10.[1]) She additionally filed for supplemental security income on that date. (*Id.*) In her application, Reed alleged that her disabling condition began on November 15, 2014. (*Id.*) On August 17, 2016, the Social Security Administration ("agency") initially denied Reed's claims for disability benefits and Supplemental Security Income ("supplemental") payments. (*Id.*) Reed requested a hearing and appeared with counsel before Administrative Law Judge Lauren G. Burstein (ALJ) on March 9, 2017. (*Id.*)

In the ALJ's June 20, 2017 decision, the ALJ found that Reed was not disabled for the purposes of the Social Security Act from November 15, 2014 through June 20, 2017, the date of the decision. (Tr. 10.) The Appeals Council (AC) denied Reed's application to review the ALJ's decision on February 28, 2018. (Tr. 1.) However, on appeal to the district court, on December 27, 2018, United States District Judge Denise Page Hood remanded the case for a de novo hearing. (Tr. 1053–56.) On remand, the ALJ was to perform a de novo hearing and

---

[1] The administrative record appears on the docket at ECF No. 8. All references to it are identified as "Tr."

offer Reed the opportunity to submit any further evidence in support of her application. (*Id.*)

Relevant to this appeal,[2] the AC issued an order on April 12, 2019 remanding the case to the ALJ to further evaluate Reed's qualification for Listing 12.02 at step three of the agency's sequential evaluation process. (Tr. 1060–61.) The ALJ was to support any conclusions with evidence in the record and evaluate any mental impairments according to 20 C.F.R. §§ 404.1520a and 416.920a. (*Id.*) Reed attended the October 30, 2019 hearing for the remanded proceeding with counsel. (Tr. 1099.) Attempting to conform with the AC's remand order, the ALJ issued a decision on November 25, 2019, again finding that Reed did not suffer from any disability for the purpose of social security benefits. (Tr. 1097.) The AC denied Reed's request for review of the ALJ's November 25, 2019 decision, which made the ALJ's November 25, 2019 decision the final decision of the Commissioner. (Tr. 999–1000.) Reed appeals that decision to this Court on the basis that the ALJ did not follow the AC's order of remand. (ECF No. 14.) Specifically, Reed attacks the ALJ's Listing 12.02 analysis as incomplete and the ALJ's conclusions as unsupported by substantial evidence. (*Id.*)

---

[2] The AC ordered the ALJ to perform a residual functional capacity (RFC) analysis and if necessary, obtain evidence from a vocational expert to clarify the effect of the limitations on the claimant's occupational base. Those findings have not been challenged in this appeal. However, the undersigned has examined the record and found that those determinations are supported by substantial evidence.

3

### B. Factual background

On November 14, 2014, Reed was injured in a car accident. (Tr. 30.) She fractured her femur and suffered from an L2 burst fracture. (Tr. 207.) A surgical team fused and fixated her L1 through L3 vertebrae with instruments to stabilize her L2 burst fracture. (Tr. 208.) Additionally, the surgical team fixated her femoral fracture with instruments. (*Id*.) A medical fixation occurs when fractured bones are stabilized with surgical wires, pins, screws, rods, or plates. *Internal Fixation*, Stedmans Medical Dictionary, Westlaw STEDMANS 337700.

Reed also suffered from a closed head injury and possibly experienced a traumatic brain injury. (Tr. 273.) However, her computed tomography scan ("CT scan") taken at the hospital did not find any acute intracranial injuries. (Tr. 207.) CT scans are a useful diagnostic tool to evaluate acute head trauma; however, they are insensitive to some brain injuries occurring in certain regions of the brain. Elan D. Louis et al., Merritt's Neurology CH20 (Daniel S. Chow & Angela Lignelli eds. 13th 2015) [hereinafter Merritt's Neurology], Westlaw LWWNEURO13TH CH20 (discussing the usefulness and drawbacks of CT scans for diagnosing brain injuries).

Additionally, her electroencephalogram (EEG) was normal. (Tr. 238.) EEGs measure electrical activity generated by neural structures. Merritt's Neurology CH25, Westlaw LWWNEURO13TH CH25. EEGs can be a useful diagnostic tool

to evaluate focal (localized to one spot) and diffuse (multiple spot) brain injuries.
*Id*.

However, Reed's neuropsychological exam indicated that Reed experienced degradation of cognitive function consistent with a closed head injury. (Tr. 531.) This extensive exam included 19 tests without counting subtests. (Tr. 512.) The exam provided an objective assessment of Reed's neurocognitive and emotional status. (Tr. 511.)

### C. The ALJ's application of the disability framework

Under the Social Security Act, disability insurance benefits and supplemental payments are available only to those who have a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (citing 42 U.S.C. § 423(a), (d) and 20 C.F.R. § 416.920). The act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A) (nearly identical definition used in the supplemental payments context); 20 C.F.R. § 404.1505(a) (Aug. 24, 2012) (identical definition with added details promulgated by the agency).

The Commissioner determines whether a claimant is disabled through a five-step sequential analysis. 20 C.F.R. §§ 404.1520, 416.920 (Aug. 24, 2012) (identical five-step analysis for disability benefits and supplemental payments). First, if the claimant is engaged in significant gainful activity, no disability will be found. *Id.* § 404.1520(a)(4) (Aug. 24, 2012). Second, the agency will find no disability if the claimant does not have a severe impairment or combination of severe impairments for a continuous period of at least 12 months. *Id.* Third, the Commissioner will determine that the claimant *is disabled* if the claimant's severe impairment meets or equals one of the impairments listed in the agency's regulations. *Id*. Fourth, if the claimant's impairment meets no listing, and the claimant has the residual functional capacity (RFC) to perform any past relevant work, no disability will be found. *Id*. Fifth, even if the claimant is unable to perform their past relevant work, benefits are denied if the claimant can adjust to other work given the claimant's RFC, age, education, and work experience. *Id*. If the Commissioner "makes a dispositive finding at any point in the five-step process," the evaluation will not proceed to the next step. *Id*.

The claimant bears the burden of proof through step four, in which they must show "the existence and severity of limitations caused by [their] impairments and the fact that [they are] precluded from performing [their] past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003) (citing *Bowen v.*

6

*Yuckert*, 482 U.S. 137, 146 n.5 (1987)); *accord* 20 C.F.R. §§ 404.1512(a)(1),

416.912(a)(1) (Mar. 27, 2017). At step five, determining whether the claimant can

adjust to other work in the economy, the burden shifts to the Commissioner. *Jones*,

336 F.3d at 474; 20 C.F.R. §§ 404.1512(b)(3), 416.912(b)(3) (Mar. 27, 2017). That

is, the Commissioner must "identify a significant number of jobs in the economy

that accommodate the claimant's residual functional capacity." *Jones*, 336 F.3d at

474.

Reed was 22 years old on the alleged disability onset date. (Tr. 1114.) Reed

had a limited education, as defined by 20 C.F.R. §§ 404.1564, 416.964, and could

communicate in English. (*Id*.) Reed had no past relevant work experience. (*Id*.)

The ALJ determined that Reed met the insured status requirement and was

insured through June 30, 2015. (Tr. 1103.) Next, the ALJ applied the five-step

disability analysis and found at step one that Reed had not engaged in substantial

gainful activity since the alleged onset date of November 15, 2014. (*Id*.) At step

two, the ALJ found that Reed had the following severe impairments: degenerative

disc disease at L2 with history of burst fracture status post-surgical repair; status-

post fracture of right leg and surgical repair; right knee impairment; asthma;

cognitive disorder secondary to traumatic brain injury; and adjustment disorder

with anxiety. (*Id*.) At step three, the ALJ found that Reed did not have an

impairment or combination of impairments that met or medically equaled one of

the listings in the regulations. (Tr. 1103–04.) Next, the ALJ determined that Reed

has the RFC to perform sedentary work with additional limitations:

> After careful consideration of the entire record, I find that the claimant
> has the residual functional capacity to perform sedentary work as
> defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant can
> occasionally climb ramps and stairs, balance, and stoop. The claimant
> can never climb ladders, ropes, or scaffolds, kneel, crouch, or crawl.
> The claimant must avoid all exposure to unprotected heights and
> operating hazardous machinery. The claimant requires an environment
> with stable temperatures. The claimant is limited to occasional
> exposure to pulmonary irritants. The claimant requires a sit/stand
> option where she can sit and stand at will, so long as she will not be off
> task more than 10% of the workday (generally she is able to sit for about
> 45 minutes before needing to stand and stand for about 30 minutes
> before needing to sit again). The claimant is limited to simple routine
> tasks, and can follow and carry out simple instructions.

(Tr. 1107.) Step four did not apply because Reed had no past relevant work

experience. (Tr. 1114.) At step five, considering Reed's age, education, work

experience, and residual functional capacity, the ALJ found that jobs exist in

significant numbers in the national economy that Reed could perform, namely as a

small products assembler I, Dictionary of Occupational Titles (DOT) #706.684-

022, with 30,000 jobs in the national economy; telemarketer, DOT #299.357-014,

with 123,000 jobs in the national economy, and product sorter, DOT #521.687-

086, with 25,000 jobs in the national economy. (*Id.*)

## II.   Discussion

### A. Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final administrative decision. The Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (citations and internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (citations omitted). The Court should examine the whole record when reviewing the ALJ's decision, and not just the facts cited in that decision. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001) (citation omitted). A finding of substantial evidence must be based on the whole record and must take evidence into account that fairly detracts from its weight. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (citations omitted).

When the ALJ considers whether a claimant's condition meets or equals a listed impairment, the ALJ is required to evaluate the evidence, compare it to the relevant listed impairment, and explain any conclusions reached, in order to facilitate meaningful review. *Pasiak v. Comm'r of Soc. Sec.*, 800 Fed. Appx. 301, 304 (6th Cir. 2019) (quoting *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411,

416 (6th Cir. 2011)). Without the proper evaluation and explained conclusions, there is no way for the court to determine if the step three analysis is supported by substantial evidence. *Reynolds*, 424 Fed. Appx. at 416.

## B. Analysis

Reed asserts that the ALJ erred by failing to comply with the remand instructions. (ECF No. 14, PageID.2008.) Specifically, Reed contends that the ALJ failed to adequately evaluate Listing 12.02 as required by the AC's remand order. *See* (Tr. 1059–1060.) (AC's order of remand indicating that the ALJ must evaluate Listing 12.02 at step three). This alleged failure is predicated upon the ALJ's purported failure to address all the requirements for Listing 12.02 and failure to obtain an expert medical opinion regarding medical equivalency. (ECF No. 14, PageID.2009.) Finally, Reed argues that the ALJ's decision is not supported by substantial evidence as to the step three analysis for Listing 12.02. (*Id.* PageID.2012.)

The undersigned finds that the ALJ did not err. The ALJ did not fail to apply the evidence to section A of Listing 12.02. Further, the ALJ was not required to obtain an expert's medical opinion when determining that Reed's impairments were not medically equivalent to any listing. Finally, the ALJ's decision was supported by substantial evidence.

**1. The ALJ sufficiently analyzed Listing 12.02.**

Listing 12.02 has a conjunctive requirement. To meet Listing 12.02, the claimant must satisfy the section A criteria, which includes medical documentation of significant cognitive decline in one or more cognitive functions. 20 C.F.R. pt. 404, subpt. P, app. 1, 12.02A (March 14, 2018). Next, the claimant must also satisfy either section B *or* section C requirements. *Id.* 12.02B, 12.02C. As Reed points out, the ALJ did not address the section A criteria. However, the AC's remand order did not instruct the ALJ to review every section of Listing 12.02, rather, it instructed the ALJ to further evaluate Listing 12.02. (Tr. 1059–61.) The ALJ did as instructed. Further, the undersigned does not need the ALJ's analysis and conclusions regarding section A to determine whether the ALJ's decision was supported by substantial evidence. The requirements of Listing 12.02 are conjunctive, requiring (1) A and C *or* (2) A and B. 20 C.F.R. pt. 404, subpt. P, app. 1, 12.02A (March 14, 2018). Since the ALJ applied the evidence in the record to the requirements of sections B and C,[3] finding that Reed's condition did not satisfy either, the Court can determine the sufficiency of the evidentiary support for the ALJ's reasoning in determining Reed's qualification for Listing 12.02.[4] *See*

---

[3] Reed did not challenge the ALJ's findings at section C, and after reviewing the record, the Court finds that the ALJ's section C determination is supported by substantial evidence.

[4] Further, the ALJ did state, "the examiner diagnosed the claimant with a cognitive impairment. Therefore, it is reasonable to expect claimant to have some limitations in this area." (Tr. 1105.)

*Reynolds*, 424 Fed. Appx. at 416 (the purpose for requiring reasoned conclusions is to facilitate proper judicial review of an ALJ's decision for substantial evidence).

### 2. The ALJ did not err by not obtaining an expert medical opinion regarding medical equivalency of the listing.

The ALJ was not required to obtain a medical expert opinion when determining that Reed's impairments were not medically equivalent to Listing 12.02. Reed misreads SSR 17-2p.[5] It does not mandate that the ALJ obtain an expert medical opinion when evaluating medical equivalency. Rather, it requires that the record contain evidence from one of three specified categories and that the ALJ rely on one of those categories of evidence when making a finding that the claimant's impairments *are medically equivalent* to a listing. SSR 17-2p. The rule explicitly denies a requirement to obtain expert evidence or medical support staff input when the ALJ determines that the claimant's impairments are not medically equivalent. SSR 17-2p. Additionally, the AC's order never mandated that the ALJ obtain this evidence. (Tr. 1059–61.) The order only stated that the ALJ *may* obtain

---

The Court reads this statement as establishing a section A finding. 20 C.F.R. pt. 404, subpt. P, app. 1, 12.02A (March 14, 2018).

[5] SSR 17-2p is likely a policy interpretation and does not carry the force of law. *See Mann Construction, Inc. v. United States*, 27 F.4th 1138, 1143 (6th Cir. 2022) (citing *Perez*, 575 U.S. 92, 96–97 (2015)). Interpretive rules articulate how the agency will interpret a statute and do not impose new rights or duties nor change the legal status of regulated parties, *id.*, meaning the agency, the courts, and the parties are not bound by these rules. *See Perez*, 575 U.S. at 97. Agency interpretive rules are subject to *Skidmore* deference. *United States v. Mead*, 533 U.S. 218, 235 (2001). However, Reed only challenges the application of SSR 17-2p to her claim but does not question whether it is a permissible policy interpretation, so the undersigned will assume it is valid and address its application only.

expert medical opinions if appropriate. (*Id.*) Thus, the ALJ committed no error by not obtaining a medical expert opinion for a medical equivalence evaluation.

### 3. The ALJ's step 3 analysis for Listing 12.02 is supported by substantial evidence.

There are four paragraph B criteria for Listing 12.02: (1) understanding, remembering, and applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. 20 C.F.R. pt. 404, subpt. P, app. 1, 12.02B (March 14, 2018). The agency uses a five-point rating scale for each of the four criteria: no limitation or mild, moderate, marked, or extreme limitation. 20 C.F.R. § 404.1520a(c)(4) (March 27, 2017). To establish disability, the claimant must show an extreme limitation in one of the section B criteria or marked limitations in two of the criteria. The agency looks to all relevant clinical findings, symptoms, and other factors including, chronic mental disorders, structured settings, medication, and other treatment. *Id.*(c)(1). The ALJ gave Reed a rating for each of the four criteria—moderate, mild, moderate, and mild—and found that Reed's impairments did not meet the Listing 12.02 requirements. (Tr. 1105–1106.)

The first criteria for section B is understanding, remembering, or applying information, which refers to the ability to "learn, recall, and use information to perform work activities." 20 C.F.R. pt. 404, subpt. P, app. 1, 12.00E (March 14,

2018). Some examples include "[u]nderstanding and learning terms, instructions, procedures; following one- or two-step oral instructions to carry out a task; describing work activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make work-related decisions." *Id*. The ALJ found Reed had a moderate limitation in understanding, recalling, and using information.

The undersigned finds that Reed has provided substantial evidence that her cognitive limitations are severe enough that a rating of marked, and possibly even extreme, would be appropriate. However, the Court must defer to an agency's decision if the ALJ's decision is supported by substantial evidence, even if there is substantial evidence to support an opposite conclusion. *See Jones*, 336 F.3d at 475 (citations omitted). There is a "zone of choice" within which the ALJ may choose to decide one way or the other. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quotations omitted). The undersigned finds that the ALJ's rating for the first section B criteria was within this "zone of choice" and was supported by substantial evidence. *See id.*

First the ALJ relied on Reed's daily functioning to support a finding of moderate limitation. (Tr. 1105.) Functioning during daily activities is a factor that

the agency uses to determine the claimant's functioning. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, 12.00F(3)(b).

Performing daily grooming activities, completing light household work, shopping in stores, watching television, listening to the radio, and reading magazines are not activities that show a claimant can learn, recall, and use information to perform work activities. *See Smith v. Comm'r of Soc. Sec.*, No. 16-11520, 2017 WL 264498, at *7 (E.D. Mich. Jan. 20, 2017) (stating that ability to perform simple daily activities such as bathing says little about the claimant's ability to focus and concentrate in a full-time work setting); *see also Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (certain minimal daily functions are not comparable to typical physical work activities). However, paying bills, counting change, using a checkbook, writing in a diary, and playing cards do provide limited but not insignificant support that a claimant can learn, understand, and apply information to simple work tasks. *Cf. Smith*, 2017 WL 264498, at *7. Those activities all require digesting information and applying it in some way. The undersigned finds that the evidence in the record establishes that Reed could perform those activities at some point during the disability period. (Tr. 151–163, 511–533.) The undersigned also finds this evidence of Reed's functioning supports the ALJ's finding. Further, Reed never contends that her inability to perform each

15

activity to the same degree after her accident undercuts the ALJ's findings that she

is not disabled.

Next, the ALJ relied on Reed's doctors' notes indicating normal functioning

in consciousness, orientation, speech, mood, remote memory, judgement, and

abstraction. (Tr. 1105.) These notes were taken during the doctors' routine mental

status examinations. (*See, e.g.,* Tr. 232.) The mental status examination is a short

assessment meant to measure certain behavioral and cognitive functioning, such as

whether a patient is delusional, hallucinating, or displaying normal emotional

responses. David C. Martin, Clinical Methods: The History, Physical, and

Laboratory Examinations, ch. 207 (3rd ed. 1990). However, Reed's neurologist

also noted that her recent memory was impaired. (*Id.*) The agency considers

medical evidence such as the doctors' notes when evaluating the severity of mental

impairments. 404.1520a(c)(1). The undersigned finds this evidence overall,

supports the ALJ's finding.

Reed further contests the ALJ's finding based on Reed's hearing testimony

and a psychological assessment performed by Dr. Richard L. Weiss. (ECF No. 14.)

Dr. Weiss performed a neuropsychological examination on Reed after he received

a referral from Dr. Vaqar K Siddiqui, Reed's neurologist. (Tr. 511.) While the

neuropsychological evaluation covers many of the same general functions as the

mental status examination, it is more comprehensive and detailed with results that

are more strictly quantified. Monique Leahy, 2 Attorneys Medical Advisor § 23:7
(2023), Westlaw MEDADV § 23:7.

Dr. Weiss assessed Reed's neurocognitive and emotional status using a
range of tests. (Tr. 512.) For the following reasons, the undersigned finds that
while much of the testing supports Reed's contention of a worse cognitive
functioning than the ALJ determined, some results of that testing support the ALJ's
decision. On the Wechsler Adult Intelligence Scale, Reed's general ability was in
the first percentile and scored in the extremely low range. (Tr. 517.) Her verbal
comprehension, working memory, processing speeds were all within the fifth
percentile, in the borderline range. (*Id.*) Her perceptual reasoning was in the first
percentile and was in the extremely low range. (*Id.*) The intelligence scale scores
support Reed's contention of a more limited functioning.

However, Reed's ability to solve story arithmetic problems was within the
16th percentile, placing her in the low average range, Reed's highest performance
on the intelligence subtests. (Tr. 519.) This rating supports the ALJ's finding since
it shows that Reed can recall and apply information to verbal arithmetic problems.

In the Wechsler Memory Scale verbal/auditory domain, Reed's immediate
and delayed memory performance was in the extremely low range. (*Id.*) However,
her recall of individual words was in the average range. In the nonverbal/visual
domain, Reed's immediate recall and delayed recall were between the extremely

low and low average range, with one test result falling in the 16th percentile. (*Id.*) Reed's results for working memory were in the borderline range. This evidence is mixed but still consistent with the ALJ's finding given Reed's higher scores on some of the memory exams.

Reed's spelling and math computation were 13th and 10th percentile, respectively, falling in the low average range. (Tr. 521.) However, Reed's reading was in the second percentile reflecting a third grade reading level. (*Id.*) Dr. Weiss stated that "[Reed] will be unable to read newspapers, magazines, textbooks, novels, and written correspondence . . . [Reed] should be able to recognize and read familiar signs and labels that are not of a complex nature." (*Id.*) Given the spelling and reading test results, "[Reed] should be able to generate relatively simple written statements." (*Id.*) Reed also "possesses a foundational understanding of . . . addition, subtraction, multiplication, and division." (*Id.*) Reed struggled, however, with fractions, decimals, and percentages. (*Id.*) Reed's academic skill levels were somewhat higher than the intelligence test scores would predict, indicating that Reed previously functioned at a higher intelligence level. (*Id.*) These results are more consistent with Reed's contention, but a few of the better results, particularly Reed's math computation performance, do support the

ALJ's finding. However, as the ALJ pointed out,[6] Dr. Weiss' statements are somewhat at odds with Reed's testimony that she enjoyed reading magazines and writing in her journal. (Tr. 1112.)

Reed also performed within the average range for the California Verbal Learning Test, another word recall test, and was in the 27th percentile. (Tr. 522.) This test result also supported the ALJ's findings.

On the Trail Making Test, Reed performed in the mildly impaired and average ranges. (Tr. 523.) This test requires attention, concentration, conceptual tracking skills, sequencing skills, and cognitive flexibility. (*Id.*) This test provides support for the ALJ's finding.

The Booklet Category Test, which measures executive function, results were in the moderately to severely impaired range. (*Id.*) This indicates Reed faces "considerable difficulty in terms of formulating and executing problem-solving strategies." (*Id.*) This result provides support for Reed's contention.

The Aphasia Screening Test, Seashore Rhythm Test, and Verbal Fluency test, which measure auditory and verbal processing skills, all resulted in average to above average ranges. (Tr. 524–25.) These results support the ALJ's decision.

---

[6] The undersigned does not agree with the ALJ that Dr. Weiss' statement that claimant would require additional time to consolidate information was vague in its application to how it would apply to the claimant's ability to perform work related activities. (Tr. 1111–12.) However, it is not for the Court to make these determinations on a blank slate, and the ALJ should be afforded deference here. *See Jones,* 336 F.3d at 475.

Finally, the spatial relations component was below average but not impaired. (Tr. 524.) Another result that supports the ALJ's decision.

The ALJ did not incorporate much of Reed's own testimony about the limiting effects of her cognitive functioning in the analysis. The ALJ only referenced the testimony of slightly limited functioning that supported the ALJ's finding. However, the ALJ is not required to point to all of the relevant evidence in the record in the decision, as long as the determinations are still supported by substantial evidence from the record. *See Loral Defense Sys.-Akron*, 200 F.3d 436, 453 (1999). Thus, the undersigned finds that this oversight does not detract much from the ALJ's finding as some of Reed's testimony is contradictory. For example, Reed initially indicated that she feeds, grooms, and walks her dog (Tr. 157), but later stated that the severity of her physical injuries prevents her from walking her dog (Tr. 29). On the other hand, Reed has been consistent in describing the limitations imposed by the cognitive issues. Reed describes having severe issues with memory, specifically remembering to do scheduled tasks. (Tr. 1025.) For example, Reed forgot about the scheduled hearing before the ALJ and had to be reminded to arrive on time. (*Id*.) Reed also testified to struggling with simple tasks like buttoning a shirt. (Tr. 1029.) She stated that many times she is unaware that she has not finished buttoning her shirt and that others must point out the mistakes for her to notice and correct them. (*Id*.) Reed also indicated that it was challenging

20

to follow simple instructions, such as a recipe. (Tr. 1028.) Reed stated that immediately after reading simple instructions for the first time and attempting to execute them, Reed forgets the task and must re-read the instructions. (Tr. 1028.) This testimony indicates a marked or extreme limitation and is consistent with many of the test results noted above. The undersigned finds that while some of Reed's testimony is inconsistent, her testimony on the limiting effects of her cognitive impairments is consistent enough to provide some support for Reed's contention.

Given the above, the Court finds the evidence is consistent with a finding of a marked impairment. However, the Court also finds that the ALJ's finding of a moderate impairment is supported by substantial evidence given the mixed nature of the results and the evidence of greater functioning in some areas. The ALJ is allowed to choose between two options that exist in the "zone of choice". *Blakely*, 581 F.3d at 406. This decision was well within that zone. Thus, the Court finds no error in the ALJ's determination of moderate limitation on the criteria of understanding, recalling, and applying.

The next section B criteria—interact with others—refers to the ability to work with managers, co-workers, and the public. 20 C.F.R. pt. 404, subpt. P, app. 1, 12.00E(2). The Court finds that substantial evidence supports a finding of mild limitation in the criterion of "interact with others." While Reed points to evidence

that might suggest a moderate limitation, the ALJ's finding is supported by the evidence in the record.

Reeds indicates that she has problems getting along with others because she can be "the sweetest person" with others but can also be "the devil." (Tr. 161.) Dr. Weiss' testing indicated that she might be "angry, resentful, impulsive, and emotionally labile." (Tr. 526.) "She may perceive conflict in fairly benign situations and may demonstrate excessive anger and resentment." (*Id*.) These statements indicate a more severe limitation than the ALJ found for this criterion.

However, the ALJ points to evidence in the record that Reed exhibited normal mood, capacity for sustained activity, and normal cooperative behavior with others. (Tr. 1105.) Reed spent time with her boyfriend and went to bars with friends. (*Id*.) Reed also indicated that she regularly played cards with others. (Tr. 160.) The ALJ also notes that there has been no sustained psychological treatment nor medications prescribed for Reed's emotional concerns. (Tr. 1105.) The agency relies on treatment evidence, or lack thereof, when making its severity determinations. 20 C.F.R. § 404.1520a. Therefore, reliance on this evidence is proper. The evidence of Reed's interactions with others post-injury and lack of psychological treatment supports the ALJ's findings.

Reed attempts to contradict the ALJ's depiction of a limited but functioning social life by pointing to testimony from the hearing noting that Reed disliked

22

"being around my home girls when they want to go and hang." (ECF No. 14, PageID.2020.) However, in this context, Reed was indicating that spending time with friends depressed Reed because she could no longer participate in activities she liked to do with her friends before the accident (Tr. 1027.)  Reed was not stating that she no longer got along with her friends due to emotional problems. (Tr. 1027.) Thus, that statement does not support Reed's contention.

During the intelligence and emotional exams, Dr. Weiss stated Reed was pleasant and cooperative during the examination. (Tr. 512.) Dr. Weiss also noted that Reed dressed appropriately, related well, engaged in spontaneous conversation, and displayed a normal range of affective expression. (*Id.*) She persisted well when confronted with difficult tasks. (*Id.*) However, Dr. Weiss also observed some impulsivity and frustration at one of the procedures. (*Id.*) Reed's other doctors have noted mood problems as well. (Tr. 234–35, 237.) Dr. Omar Darwish, Reed's primary care physician, noted that Reed began to "scream and curse, and [say] what the is F . . . dr R U [sic]" when the doctor referred Reed to a pain clinic rather than prescribing opioids for pain management. (Tr. 218.) The evidence of Reed's interactions with her providers is also mixed and supports both Reed's position and the ALJ's finding.

Finally, Reed relies on evidence of an emergency room visit for a stab wound. (ECF No. 14, PageID.2020.) On April 27, 2019, Reed did receive

23

treatment from the emergency department at Ascension St. John Hospital for a stab wound. (Tr. 1549.) But the notes for that visit only indicate that Reed was stabbed twice in the arms, describing only the injury and pertinent medical history. (*Id.*) The notes provide no context on the event of the stabbing. (Tr. 1533–1560.) Additionally, there is no testimony in the record about what occurred during the stabbing incident. There is no way for the Court to determine whether the stabbing was the result of any of Reed's emotional problems without more background information. This evidence does not support Reed's contention.

The evidence of Reed's ability to function with others is again mixed and could support a finding of a more severe limitation than the ALJ found. However, the evidence provides more than enough support to justify the ALJ's decision with substantial evidence. This is another decision that took place within the "zone of choice" afforded to the ALJ. *See Blakely*, 581 F.3d at 406.

Reed next challenges the ALJ's finding of a moderate limitation on the third section B criteria—concentrate, persist, or maintain pace—referring to the ability to sustain focus on work activities and stay on task. 20 C.F.R. pt. 404, subpt. P, app. 1, 12.00E(3). The Court finds that the ALJ's decision is supported by substantial evidence. Reed argues that the evidence shows that she struggled to sustain focus, became easily distracted, reacted impulsively, and had trouble

controlling her anxiety. (ECF No. 14, PageID.2020.) However, the evidence in the record does not support a finding of a marked or extreme limitation for section B.

This is the area in which Reed had the most success on Dr. Weiss' extensive evaluations. Dr. Weiss indicated that Reed "persisted well when confronted with difficult tasks." (Tr. 512.) On the Trail Making Test, which tests concentration and attention, Reed's performance only indicated mild impairment or even average performance. (Tr. 523.) Reed's testimony also indicates a strong ability to persist and concentrate through frustrations caused by her impairments. In the hearing Reed, commenting on struggling to put on clothes, "I'm like, oh, I did it wrong, and I have to do it all over again." (Tr. 1029.) And "[s]omething could be written down right in my face, I could read it, then I go to do it and I have to come back and read it again." (Tr. 1028.) Additionally, Reed answered yes when asked if Reed must relearn things. (Tr. 1029.) These statements suggest a willingness to persevere in the face of the challenges posed by Reed's cognitive ailments. On the other hand, Reed also testified to giving up after becoming frustrated when she could not remember the words to use when writing in her journal. (Tr. 1023.) Reed also testified to losing interest in being around friends due to depression caused by her limitations. (Tr. 1027.) This testimony provides some support, although mixed, that Reed can persist through the challenges that she faces and finish tasks. In total, the evidence substantially supports the ALJ's finding that Reed can concentrate,

persist, and maintain pace with a moderate limitation. This is another decision within the ALJ's "zone of choice." *See Blakely v. Comm'r of Soc. Sec.*, 581 F.3d at 406.

Finally, Reed challenges the ALJ's analysis as unsupported by the evidence for the lack of any substantial medical equivalence analysis or evidentiary support. (ECF No. 14.) As previously stated, the ALJ is not required to obtain a medical expert opinion on medical equivalence. *See* SSR 17-2p. And while the ALJ did dismiss a finding of medical equivalence with a conclusory statement, SSR 17-2p allows the ALJ to do so. *See* SSR 17-2p (stating that the adjudicator does not need to support their findings with evidence in the record if they believe there is no reasonable support for a finding of equivalence). However, the ALJ's decisions must still be supported by the weight of the entire record. *Rogers*, 486 F.3d at 248. Additionally, the ALJ must consider all of the evidence provided. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006). But, the ALJ is not required to directly address every piece of evidence submitted by a party. *Id*. After reviewing the whole record, the Court finds that the ALJ's decision on medical equivalence is substantially supported. Given the above analysis concerning the severity of Reed's mental impairments, the Court does not find that the weight of the evidence required a finding of medical equivalence. Therefore, the ALJ

committed no error by denying medical equivalency without pointing to evidentiary support.

The ALJ complied with the AC's remand and the agency's regulations and policies. Therefore, the ALJ did not commit legal error. Many of the ALJ's evidentiary findings were close calls, but the findings were well within the "zone of choice" afforded to the agency. *See Blakely v. Comm'r of Soc. Sec.*, 581 F.3d at 406. Thus, substantial evidence supports the ALJ's decision.

## III.   Recommendation

For the preceding reasons, the undersigned **RECOMMENDS** that Reed's motion for summary judgment be **DENIED**, that the Commissioner's motion for summary judgment be **GRANTED**, and that the decision of the Commissioner be **AFFIRMED**.


Dated:  March 7, 2023                     s/**Jonathan J.C. Grey**
                                          Jonathan J.C. Grey
                                          United States Magistrate Judge

### Notice to the Parties About Objections

Within 14 days of being served with a copy of this Report and Recommendation, any party may object to and seek review of the proposed findings and recommendations set forth above. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). If a party fails to timely file specific objections, any further right of appeal is waived. *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991). Only specific objections to this Report and Recommendation are preserved for appeal; all other objections are waived. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). Each objection must be labeled as "Objection No. 1," "Objection No. 2," etc. Each objection must specify precisely the provision of this Report and Recommendation to which it pertains. In accordance with Local Rule 72.1(d), copies of objections must be served on this Magistrate Judge.

A party may respond to another party's objections within 14 days after service of any objections. Fed. R. Civ. P. 72(b)(2). Any such response should be concise and address each issue raised in the objections in the same order and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

**Certificate of Service**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 7, 2023.

<u>**s/ J. Owens**</u>
Julie Owens
Case Manager

29